NEHEMIAH T. ADAMS AND ANOTHER *vs.* JAMES W. MANNING AND ANOTHER.

The petitioners and respondents were severally owners of sundry neighboring mills and mill-sites on the same stream. At a point higher up a branch emptied into the stream, which for thirty years had, by means of a dam and wide space for flowage, been kept as a reservoir for the use of all the mills, the dam having been originally constructed and the reservoir owned by parties whose rights were in part held by one of the petitioners and by the respondents. At the end of thirty years the grantors of the respondents, who were riparian proprietors next below the reservoir, built a new dam a little below the old one, and about three feet higher, submerging the latter, which new dam the respondents claimed the right to control as to its use for detaining and discharging the water of the reservoir. The owners of the old dam made no objection to the building of the new one, believing that it would be a substitute for the old one, and of greater benefit to all parties interested. Upon a bill for an injunction against the detention and discharge of the water to the injury of the petitioners as mill owners, it was held—

1. That, as matter of law, so far as the rights of all the parties were concerned, the artificial became by long continued use the natural condition of the stream.

2. That each mill owner had acquired a right to the use of the stored water in the reasonable and customary manner of using it, having a due regard to the rights of others to a like use; and this so long as the owners of the old dam and reservoir should continue their use for storage merely.

3. That the respondents, in building the new dam and thereby preserving the reservoir, had practically continued the old reservoir in existence, with all the limitations and conditions which the law had placed upon it.

4. That the silent consent of the owners of the old dam and reservoir to the erection of the new dam by the grantors of the respondents, did not carry with it a permission to detain or draw off the water unreasonably as against them.

When controversies arise between mill-owners, each of whom has a separate right to the use of water to be drawn from a common reservoir on irregularly recurring occasions of need, the time and manner depending upon the quantity in store, the needs of others, and established custom, it is the proper office of a court of equity to call all of them before it and in one proceeding and by

one decree determine their respective rights and obligations. A separate action at law to each for each wrongful detention or discharge of the water, will not furnish adequate relief.

BILL IN EQUITY for an injunction against the unreasonable detention and discharge of water from a reservoir; brought to the Superior Court in the county of Windham. The following facts were found by a committee:

The petitioner Adams, and the petitioner Warner as administrator on the estate of Thomas Warner, deceased, are respectively owners and in possession of ancient mill-sites on a stream of water in Woodstock. On this same stream the respondents are joint owners and in possession of two ancient mill-sites situated above those of the petitioners. All these several mill-sites are quite valuable, each has a suitable dam and pondage of its own, and mills were in successful operation on each of them until, in 1875, one of the mills of the respondents was consumed by fire, and the other soon after ceased to be operated; the mills of the petitioners are still being run.

The stream is abundant during the winter and spring months, but during the summer months the supply of water would be inadequate for the wants of the mills were it not for the reservoir hereinafter mentioned. A few rods above the respondents' upper mill-site a branch from the south enters the main stream. The controversy between the parties relates to this branch. In its original condition it was of small value, but some forty or more years ago a dam of considerable size was constructed across it, whereby a reservoir was created called the south meadow reservoir, by means of which the abundant rains of the winter and spring were kept back and stored up for summer use, and by this means the branch was made of great value to the mills of both parties to this suit, and to other mills below. The parties who built this dam were grantees of one McClellan, by a deed dated July 20th, 1836. The rights of those grantees are now vested in part in the respondents and the petitioner Adams. This old dam and reservoir continued in beneficial operation until about 1867.

During the existence of this old dam there appears to have been no difficulty in so managing its gate as to accommodate and supply the wants of all the mill owners below it. None of them needed the water of the branch in winter and spring, and all needed it in the summer. All the mills had wants substantially alike, all were in operation during the day, and closed work at about the same hour at night.

In 1866 Joseph and Walter Cocking became owners in fee of land immediately below the old dam on both sides of its outlet, and about the year 1867 they built on this land a dam located about twenty rods below the old dam. The new dam was and is three and $\frac{23}{100}$ feet higher than the level of the old, and wholly submerged it. Under the flowage act the Cockings obtained a decree of court authorizing the flowage. The owners of the old dam and reservoir were not made parties to the petition, but they made no objection to the building of the new dam, nor until recently have they or any of them objected to its continued maintenance, and by thus not objecting they have given a silent consent, under the belief however that the new dam and new reservoir created by it would be, as until lately it has been, a substitute for the old, and of greater benefit to all concerned than the old were.

Until the burning of the respondents' mill in 1875 and the disuse of the one not burned, the new dam and reservoir were used in a manner convenient and satisfactory to all the riparian proprietors. The respondents and those under whom they claim title maintained the dam, and by means of it a supply of water was stored up in the wet months, and used prudently during the dry season. They took entire charge of the gate and opened it for the supply, primarily of their own mills, but when the water was needed for their own mills it was also needed by the mills below and came down to them. When not wanted by the respondents it was not wanted by the petitioners, and was stored up for times of need, and if mills were now in operation on the mill-sites of the respondents they would naturally have precisely such want of the water as would necessarily accommodate the mills below.

But after the stoppage of their own mills, they had no use for the water to carry machinery, and they soon thereafter began to control the gates in a manner unsatisfactory to the petitioners, and hence arose the contests which are the subject of this suit.

In these contests the respondents claimed to be, as they in fact were, the sole owners in fee of the existing dam, and of the ground on which it is built, and of the mill-sites below the dam. They also claimed full right of flowage by means of the dam of all the land covered with water by it, which right they had exercised without challenge or objection from 1867 down to a very recent period. They therefore asserted as against these petitioners and against all others the absolute right to take sole charge and control of the dam, and to open and close its gates without regard to the wants of the petitioners and other riparian proprietors below; they denied all obligation in the management of the gates to consult the convenience or needs of the petitioners. They also emphatically denied the right of the petitioners under any circumstances to come upon the dam or open and shut its gates in order to supply water to the mills below. They asserted these rights both by acts and words.

On several occasions when there was a good supply of water in the reservoir, the use of which had become essential to the operation of the petitioners' mills, and when the respondents were not running or preparing to run their own mills, they caused the gate to be closed and fastened down, and refused to open it themselves or allow it to be opened by the petitioners. These acts were not done wantonly or maliciously, but under an earnest and oft-repeated. claim of the right absolutely to control the dam and gate, without being under obligation to consult the needs of the petitioners.

They urged as a reason for keeping the gate closed in summer that their property there was for sale, and that persons contemplating its purchase declined to buy because the reservoir was not well filled, and that if the water should be drawn off to accommodate the petitioners, purchasers would be deterred from buying.

Subject to the opinion of the court I understand the law to be that the respondents must exercise their rights reasonably, and that what in each particular case is to be done or left undone is a mixed question of law and fact dependent very much on the capacity of the stream and upon its nature, as that may have become modified by long continued use.

In this case the dam in question is not an ordinary dam to pond water for the current use of a particular mill, but obviously is a reservoir dam, by which to store water in wet seasons for use in dry seasons of the year. The branch on which the dam is built has for more than forty years past been applied for that purpose, primarily for the use of the mill-sites next below it, but secondarily for the common benefit of all the mill-sites lower down the stream; the stream was being so applied by common consent when the respondents' dam was built. The business upon the stream has grown up and adapted itself to such application. The branch is of little value if otherwise applied, but of great value to all concerned if its waters are stored up and used as they have been.

Upon these facts the question is submitted to the court whether or not the acts herein found to have been done by the respondents in shutting and fastening the gate of the reservoir were or were not in violation of the petitioners' rights as riparian proprietors, and whether or not by reason of such acts and the claims made in connection therewith the petitioners are entitled to the injunction prayed for, against closing the gate when water is needed for their mills below, and if so, under what qualifications.

The petitioners claimed that the respondents had not only detained the water of the reservoir unreasonably, but that they had opened the gate and allowed the water to escape when it was not needed by any one, and when they ought to have allowed it to accumulate. In regard to one of these occasions complained of, when the gates were opened in May, 1878, the respondents did not act wantonly, but opened the gate because they had an apprehension that the dam was in peril of being injured by too great pressure of water upon it.

They however asserted the absolute right to let the water escape at their own pleasure, and denied that any obligation rested upon them to maintain the dam when they themselves had no use for the water, or to open and close its gate to suit the convenience of mill owners below; and acting upon this idea of their rights they have occasionally opened the gate and allowed the water to escape when they had no occasion to use it themselves and when not needed by the mill owners below, and when its retention would have been no injury to themselves.

The petitioners did not claim that any legal obligation rested upon the respondents to continue the maintenance of their dam, but claimed that so long as they did maintain it and exercise control over it and refuse to allow any interference in the management of the gate by the mill owners below, they might reasonably be required to exercise their control so that the water might be prudently stored and not suffered to run to waste.

Upon the foregoing facts the question is submitted to the court whether in this respect the petitioners are entitled to the injunction prayed for, and if so, under what qualifications.

The petitioner Adams claimed that the rights of the original grantees under the McClellan deed still remained in existence, and that by virtue of them he had an interest in the existing reservoir and in its waters and management. The respondents claimed that the grantees under the McClellan deed consented to the building of the new dam, and that the old dam and reservoir were blotted out of existence by the building of the new dam and its use and maintenance since, and that if Adams had any rights in the old dam and reservoir they were such as had no value in the present controversy, and that after long acquiesence of his grantors in the submersion of the old dam he was not entitled to the interposition of a court of equity to protect any supposed rights of his in it.

Whether upon the foregoing facts Adams has rights in the premises which are injuriously affected by the acts complained of is submitted to the court.

The respondents are in possession of, and own in their own right in fee, the dam, gates, flume and embankments of the reservoir, and since the erection of the new dam they have been in the undisturbed and unchallenged exercise of the right of flowage by means of the dam, and have the right so to flow unless in the opinion of the court upon the facts found they have not the right to overflow the old dam.

The value of the old reservoir was small in comparison with the value of the present one, provided the present shall be used as the old one was, for the common benefit of the mill owners below. The proprietors of the old dam have never claimed any rights in the old dam until since the burning of the respondents' mill, and never until then have complained or had reason to complain that any injury had been done by overflowing the old dam. The petitioners have never expressed any desire or intention to repair the old dam, and its repair will be of no benefit to them so long as the respondents' dam shall be maintained.

Upon these facts the case was reserved for the advice of this court.

*T. E. Graves* and *J. Halsey*, for the petitioners.

1. As riparian proprietors the petitioners are entitled to a reasonable use of the stream against an unreasonable use or detention of it by the respondents. The latter had not acquired any right, by grant or prescription, to control the water. Their dam was erected in 1867. Fifteen years had not elapsed when this suit was brought. If they had used it in a manner adverse to the petitioners it must have continued fifteen years. *Parker* v. *Hotchkiss*, 25 Conn., 321; *Brace* v. *Yale*, 10 Allen, 441. The detention in this case was not to raise a head of water necessary for the operation of any machinery, and it was allowed to escape when it was not needed by any one. Such use is unreasonable, as matter of law, and can not be justified except by grant or prescriptive right. *Phillips* v. *Sherman*, 64 Maine, 171; *Clinton* v. *Myers*, 46 N. York, 511; *Thurber* v. *Martin*, 2 Gray, 394; *Gould* v. *Boston Duck Co.*, 13 id., 442. In considering this question

the local customs of the stream are proper subjects of inquiry. *Keeney & Wood Manf. Co.* v. *Union Manf. Co.*, 39 Conn., 585; *Thurber* v. *Martin*, 2 Gray, 394. It is found that "all the mills had wants substantially alike; all were in operation during the day, and closed much about the same hour at night." Also that "the dam in question is not an ordinary dam to pond water for the current use of a particular mill, but a reservoir dam, to store water in wet seasons for use in dry seasons. The branch on which the dam is built has for more than forty years past been applied for that purpose; primarily for the use of the mill-sites next below it, but secondarily for the common benefit of all the mill-sites lower down the stream. The stream was being so applied by common consent when the respondents' dam was built. The business of the stream has grown up and adapted itself to such application." The rights of the petitioners to the reasonable use of the water are not affected by the fact that they did not object to the building of the new dam. It is found that they acted "under the belief that the new dam and reservoir would be, as until lately it has been, a substitute for the old, and of greater benefit to all concerned than the old one was." Their acquiescence in the erection of the new dam might deprive them of a right to an injunction against its continuance, but never against its misuse to the prejudice of their rights. The respondents' right of flowage, however acquired, does not affect the rights of the petitioners as lower riparian proprietors.

2. The record finds that under the grant from McClellan of July 20th, 1836, the grantees built a dam about twenty rods above the one in question, and "it continued in beneficial operation until 1867," a period of over thirty years, when it was submerged by the new one, and "that there is no difficulty in managing its gate so as to accommodate and supply the wants of the mill owners below." The petitioner Adams became an owner in the old dam and reservoir in 1875. The deed was a grant and the old dam was built under the rights conveyed. The building of the old dam, and the use of it from 1836 to 1867 under the claim of right, gave the owners

of the old dam rights by prescription, as well as by grant, to have the water drawn and used as it is shown to have been done. *Brace* v. *Yale*, 10 Allen, 441. The new dam not having been erected fifteen years before suit, no rights in the old dam have been lost by any acts of the respondents or by any laches of the petitioners. *Clinton* v. *Myers*, 46 N. York, 520; *Harding* v. *Stamford Water Co.*, 41 Conn., 94.

3. An injunction is the proper remedy. A legal remedy would be inadequate to secure the petitioners in the enjoyment of their rights to have the water used as prayed for. Angell on Watercourses, §§ 444, 5, 6; 2 Story Eq. Jur., §§ 926, 7; Kerr on Injunctions, 393; *Belknap* v. *Trimble*, 3 Paige, 577; *Bullou* v. *Hopkinton*, 4 Gray, 324. In the last case Shaw, C. J., said:—"In regulating the rights of mill owners, and all others, in the use of a stream, whenever numbers of persons are interested, equity is able by one decree to regulate their respective rights, to fix the time and manner in which water may be drawn, and within what limits it shall or shall not be drawn respectively; and thus it affords a more complete and adequate remedy than can be afforded by one or many suits at law." The respondents interrupted the petitioners in the enjoyment of their rights, when it could not benefit them in any other way than by compelling the petitioners to buy their peace. Under such circumstances they have no particular claim to the favor of a court of equity. *Belknap* v. *Trimble*, 3 Paige, 605.

*J. J. Penrose* and *G. W. Phillips*, with whom was *H. Johnson*, for the respondents.

1. The granting of an injunction rests in the sound discretion of the court. *Hine* v. *Stephens*, 33 Conn., 497. No injunction should be granted except for the prevention of great and irreparable mischief, and where adequate remedy cannot be had at law. *Bigelow* v. *Hartford Bridge Co.*, 14 Conn., 580; *Whittlesey* v. *Hartford, Providence & Fishkill R. R. Co.*, 23 id., 433. It is rather the duty of the court to protect established rights than to establish new and doubtful ones. *Roath* v. *Driscoll*, 20 Conn., 539. On an application

of these principles to the facts found the petitioners are not entitled to an injunction. The respondents are the owners of the dam, the land upon which it stands, and the land flowed, and are in possession; the petitioners have neither title nor possession. The latter had no right to insist upon such use of the water as would deprive the respondents of the benefits of their ownership of the reservoir and mills below. It was not an unreasonable detention of the water for the respondents to shut their gate and keep it closed for the purpose of filling the reservoir, in case they should desire to sell their mills, as the natural stream would run over the roll way of the dam as soon as the reservoir was full, and be all the while leaking through it more or less. The finding shows that this was the sole purpose for which it was done. This instead of being to the injury of the petitioners was for their benefit. There is nothing in the finding that shows any appreciable injury to the petitioners, much more any irreparable injury that calls for the interposition of a court of equity by injunction. The finding shows that the benefits from the reservoir were purely artificial. The south branch on which it is situated was of no value without it. The petitioners then, as riparian proprietors, cannot complain of its use and management by the respondents. An action at law for damages against parties responsible, and within the jurisdiction, would have been a full and adequate remedy, and no injunction should be granted until the rights of the petitioners, if any, have been established by a judgment. Kerr on Injunctions, 199.

2. The finding shows that the opening of the gate, like the shutting of it, was not done wantonly, but because the respondents had an apprehension that the dam was in peril from too great pressure. Surely no injunction should be granted for such act. But it is found that they asserted their absolute right to let the water escape at pleasure, and denied that any obligation rested upon them to maintain the dam. No obligation did rest upon them to maintain the dam, (this is admitted by the other side,) and consequently they had a right to let the water escape. This is obvious from the find-

ing that the respondents were the absolute owners of the dam, flowage rights, and the land in fee. This being so, they had a right to control it without consulting the proprietors below, so far as any use of the water ponded by them was concerned. And this is all the finding shows that they did. Again, in this part of the case the petitioners had adequate remedy at law if any wrong was done them.

3. The old dam was abandoned and blotted out of existence with the consent of all its owners. *Taylor* v. *Hampton*, 4 McCord, 96; Washburn on Easements, 550, 559. The petitioners gained no rights in the new reservoir by virtue of ownership in the old. If the extinguishment of the old reservoir by the erection of the new was wrongful, it created a right of action for the wrong and nothing more. But it was not wrong, but, as said before, was done by consent. By long acquiescence in the submersion of the old dam neither Adams nor his grantor would be entitled to the interposition of a court of equity to protect any supposed right. Kerr on Injunctions, 202, 386. Adams's grantor had knowledge of the building of the new dam, and the consequent submersion of the old reservoir. His acquiescence in it estops Adams now. But it is denied that he has any right at all, and until a right is established at law no injunction should be granted.

PARDEE, J. Each of the petitioners is the owner of an ancient and valuable mill-site with mill in operation on a stream in the town of Woodstock; on the same stream and above these the respondents are joint owners of two like mill-sites, with an idle mill upon one and none upon the other. Above these a branch empties into the main stream; upon this, forty years since, a dam was erected for the purpose of creating a reservoir for storage which continued in beneficial use to 1867. In that year the grantors of the respondents submerged it by the erection of a dam twenty rods below, at which point they were riparian proprietors on both sides. For about eight years thereafter they and their successors, including the respondents, drew the water stored by it in such quantities and at such times as were most bene-

ficial to all the mills, for the needs of all were substantially the same. But in 1875 the respondents, having lost one mill by fire, ceased to operate the other, and on several occasions thereafter under a claim of right detained water when it was essential to the operation of the petitioners' mills, and on others allowed it to flow when it was not needed.

The petition seeks to restrain them from a repetition of these acts, and the case is reserved for the advice of this court.

Thirty years before the erection of the defendants' dam, the branch for mill purposes practically ceased to be a running stream and became a reservoir for storage, from which water was drawn at such times and in such quantities only as would best supply the special and irregularly recurring needs of mills, the detention and drawing being by the consent and to the advantage of the proprietors of the old dam and of those of the mills below as well. As a matter of law, so far as the rights of all these are concerned, the artificial became by this long continued use the natural condition of the stream; to it thus changed they had adapted their respective mills as to construction, capacity and mode of use; as an element of value in his privilege each had thus acquired a right to the use of this stored water in the reasonable, proper and customary manner and time of using it, having due regard to the rights of others to a like use; and this so long as the proprietors of the dam should continue its existence for the purposes of storage merely. In 1867, therefore, the proprietors of the old dam and reservoir had not the right to continue it in existence for storage and at their will to detain water therein or discharge it therefrom unnecessarily, unreasonably and to the injury of others; their power over it was held in strict subjection to this law of a reasonable and customary use as between themselves and other mill-owners below, which thirty years of such use had imposed upon them; and the proprietors of the new reservoir by submerging the old one practically took it to themselves and continued it in existence; but they took and continued it with all the limitations which this law had placed upon it.

Again, it is found that the respondents' grantors submerged the old dam without contract permission from, or compensation to its owners, one of whom is a petitioner; that these knew of, but did not object to the erection of the new one, remaining silent because of their belief that it would be a substitute for and more beneficial than the old one; that during eight years the successive proprietors of the new one, including the respondents, observed the established law of a reasonable use of the water of the branch as a reservoir for storage, detaining and drawing it at times and in quantities most beneficial to all proprietors; and, that only since 1875 have they violated that law. The import of this finding is that in erecting the new dam the original proprietors thereof did not assert or exercise any rights in hostility to those of the proprietors of the old dam, but intended, and designed to be understood as intending, only to make them more beneficial than before. Thus taking the old reservoir to themselves and practically continuing its existence, they took it with all the limitations which this law of use had placed upon it. The silent consent thus received carried with it no permission either to detain or draw water unreasonably as against those who gave it; these last by giving have not barred themselves from a court of equity.

Therefore upon either ground they may maintain their petition.

And, when controversies arise between mill owners, each of whom has a separate right to the use of water to be drawn from a common reservoir for storage on irregularly recurring occasions of need, the time and manner depending upon the quantity in store, the needs of others and established custom, it is the proper office of a court of equity to call all of them into its presence and in one proceeding and by one decree determine their respective rights and obligations. A separate action at law to each, for each wrongful detention or drawing, will not furnish adequate relief; practically, no relief at all.

The Superior Court is advised to command and enjoin the respondents, their servants, workmen, and agents, and all and every one of them, under a proper penalty that they do

henceforth, so long as they maintain the new dam described in the petition, altogether and absolutely desist from drawing water thereby detained except for the supply of their mills; and if they have no occasion for drawing for such use, to desist from preventing or hindering the petitioners from drawing it for the supply of their mills in the reasonable and customary mode as to time and quantity. This order not to be construed as requiring the detention of water when the existence of the dam would be thereby put in peril.

In this opinion the other judges concurred.