(Judge Haynes did not sit in this case.)

ISAAC H. DETWILER v. TOLEDO (CITY) ET AL.

1. PRIOR LESSEE MAY HAVE INJUNCTION TO PREVENT SUBSEQUENT LESSEE FROM REDUCING HIS WATER RIGHTS.

D., having by lease from the State Canal Commissioners, the prior right, for the purpose of running his mill. to draw from a certain level of the Miami & Erie Canal, surplus water not necessary for the use of navigation, to the amount of 1800 cubic feet of water

Vol. III. C. C.   12

per minute, may maintain an injunction against a subsequent lessee of said Commis-sioners, restraining such subsequent lessee from drawing water from said level at such times or in such manner as to interfere with D.'s prior right thereto, D.'s right to draw some water from said level being admitted, and the controversy between the parties being as to the extent and priority of their respective rights to such surplus water.

2. It Need not Appear that Complainant first Applied to State Authorities for Relief.

Such action may be maintained without its appearing that D. had, before its com-mencement, unsuccessfully applied to the state authorities to let more water into the higher levels of the canal, or otherwise to obviate the injuries complained of.

3. Court has Equity Jurisdiction to Determine Extent of Disputed Rights.

The fact that both parties have rights, but the extent of them is in dispute, gives equity a jurisdiction to determine such extent without the rights being first established in a law action.

4. Lessees above His Level are not Necessary Parties.

The lessees of water power on levels of said canal lying above the level in question, though proper parties to such proceeding, in order that the rights of all parties claiming the right to use surplus water which might affect the quantity of surplus in the level in question may be determined and defined in one action, are nevertheless, not necessary parties, in an action wherein no averment is made in the pleadings that such lessees on the superior levels are using such water in excess of the amounts leased to them by contracts prior in date to the plaintiff's lease

5. Commissioners Could, by a Subsequent Writing, Define Amount of Water to be Used.

It was competent for the Canal Commissioners and the owner of lease obtained in 1859 for the purpose of avoiding disputes, if acting reasonably and in good faith, by a subsequent written instrument,.to fix and define the number of cubic feet of water per minute which should be deemed equivalent to the quantity sufficient to propel said several kinds of machinery as provided in said lease, and such subsequent modifying contract made in 1869, affords a valid construction of said original lease as against another lessee of water power from said level under an unrecorded lease from said Commissioners, granted in 1866, but under which no possession was taken till after 1869, and of which subsequent lease no actual notice or knowledge came to said original lessee or his assigns, till after 1869.

6. Prior Lessee is, not Estopped by Seeing Second Lessee Erect Expensive Machinery.

D. is not estopped to maintain his action for an injunction by standing by and seeing defendants' mill constructed without objection, there being no allegation nor proof that he knew or had notice or knowledge of facts charging him with knowledge that the defendants' mill would require so much water from said level as to interfere, with his rights under said lease.

7. Court. will, Appoint Commissioner to Report Plan of Adjusting Rights of Lessees.

When the court has ascertained and determined the respective rights of owners of water power privileges, and difficulties appear as to the most practicable method of carrying the decree into execution, the court will appoint a commission to investi-gate and report to the court a practicable plan for effectually securing to the parties concerned their respective rights to the use of the water in question, unless the parties themselves agree upon some satisfactory method.

Error to the Court of Common Pleas of Lucas county.

Bentley, J.

By consent of counsel, this case was submitted to this court when held by two judges, Judge Scribner and myself, towards the close of last term, the argument being continued and submitted at this term.

The action is to enjoin the city of Toledo and the other defendants, (who constitute the Work-house Board of the city) from interfering with the alleged rights of the plaintiff as the lessee of the state of certain water rights on the Miami & Erie Canal in Toledo.

The plaintiff claims that he is the assignee and owner of a certain lease from the state of. Ohio, granting the right to use for his mill purposes, out of the canal, on the level next above lock.2, water to the extent of 1600.feet per minute, and that his said right is prior and superior to any right of the said defendants to use any of the water from said level. and that he has long been in the possession of said water right, and has been using the water to run his mill, and that it is necessary that he have the full amount of water thus secured

to him for that purpose, and that if he is deprived of it, his property will be of no value. etc., and that the city and the other defendants are about to cut through the banks of said canal, and tap said level, and draw therefrom a large quantity of water, to-wit: 1700 feet per minute, for the purpose of running the machinery of the workhouse of said city, and that there is not water enough coming into said level over and above what is required for navigation, to furnish the plaintiff and the defendants, and that the defendants are proposing to take said water under an alleged lease to the city granted by the state in 1879, which lease is subsequent in date and right to the lease under which the plaintiff claims, and that if the defendants are permitted to carry out their said purpose, it will result in irreparable damage to the plaintiff.

The defendants 'answer, admitting their purpose to draw 1700 cubic feet of water from the said level to operate the work-house machinery, but deny that the plaintiff has a prior right to the use of any water in said level, and deny the other allegations in said petition.

The defendants further say that their lease is prior and superior to the plaintiff's lease, and that a large amount of money has been expended by the city in placing machinery, etc., and preparing to use said water at the work-house, and that it is highly necessary to have the use of the water for that purpose, and that enough water runs to waste from said level after supplying the plaintiff to supply the defendants said 1700 feet per minute. The defendants also set up that the plaintiff has long been in arrears as to the payment of the water rents provided in his lease, and that his lease has therefore become forfeited, and is no longer in force.

Disposing of this last defense, we observe that it is not stated in the answer that the state had declared a forfeiture of the plaintiff's lease, and no proof was offered to that effect, and we hold that the existence of facts justifying the state in declaring the forfeiture for non-payment of rent without its having exercised its option so to do, will not avail the defendants as a defense.

The principal questions presented to this court were these, to-wit:

1. Is there generally, and when the water is at its ordinary stage, surplus water over that needed for navigation, coming to that level, sufficient to supply both leases?

2. Has the plaintiff, by reason of his lease, a right to have 1,600 feet of surplus water per minute out of said level before the defendants have a right to take therefrom any that will cut him short of that amount?

As to the quantity of water coming into said level, and as to the amount actually used by the plaintiff and defendants, much testimony was given before us, for this action was begun August 9, 1884, and no temporary injunction being obtained, the defendants 'proceeded to tap said level, and to use the water therefrom to run their machinery pending the litigation. Several experts in the matter of hydraulics testified, and there was much conflict of testimony as to some points; but we think it clearly established by the preponderance of the evidence that the defendants cannot use the water as they claim the right of doing, without materially interfering with the use by the plaintiff of 1,600 cubic feet of water per minute, and that there is not available surplus water coming into the level in question to supply the claims of both plaintiff and the defendants, and that the defendants by the use of the water in running the work-house machinery have on many occasions prevented the plaintiff from getting 1,600 cubic feet of water per minute, and thus prevented him from running his mill as he had a right to run it, if in law and fact he has the prior and paramount rights which he claims.

As to the priority of rights to the use of the water, we find the facts to be as follows:

February 18, 1859, the state, acting by Abner L. Backus, one of its canal commissioners, executed and delivered to James Myers a lease for thirteen years from the 29th day of March, 1859, with the right to renew the same for thirty additional years, thereby leasing "the use and occupation of so much of the surplus water not necessary for the use of navigation as will be sufficient, when applied on the most approved machinery, to propel one saw, also a sufficient quantity of water to propel two pairs of four and one-half feet mill stones for the manufacture of superfine ower, together with all the labor-saving machinery stones for the manufacture of superfine flour, together with all the labor-saving machinery attached; the water to be used is to be applied in such manner and upon such kind of wheel as the acting commissioner, resident engineer, or other agent of the state may direct; the rents to commence as follows: for the required quantity for the saw, on May 1, 1859, and for the two run of stones, as soon as they may be respectively put in operation. It is also understood that the said quantity of water may be used for the propulsion of any othe'

kind of machinery. The water hereby leased to be taken out of the level of the Miami & Erie canal, next above lock No. 2 Miami canal and lock No. 2 Toledo side-cut, and to be conveyed to the mills or other hydraulic works from between two regulating weirs, to be constructed by, and at the expense of, the party of. the second part (Myers) as hereinafter specified," and certain lands .are also leased.

The amount of rent, and the times of the payment thereof, are fixed in the lease, and there is a provision for the forfeiture of the lease for the non-payment of the rent. This lease also has the following provisions: "the weir over which the water is drawn from the canal to be so placed and formed that the top of the weir shall not be more than six inches below the level at which it shall be required to sustain the surface of the water in that part of the canal from whence the water is to be drawn, and the other or second weir to be so placed and formed that the top thereof will be at least one inch lower than the top of the weir over which the water is drawn from the canal, and of such length and other-wise so constructed that a uniform quantity of water will flow from the upper to the lower levels of the canal, whether the hydraulic works are in operation or not."

It is also provided that these weirs and all necessary gauges, etc., shall be built and placed according to a plan furnished by and subject to the direction and inspection of the state canal commissioner or engineer, who may at any time enter on the works, and repair, change or reconstruct any of said weirs, and charge the expense of the same to the lessee. There is also a provision in the lease that rent shall not be abated on account of t. e insufficiency of water, and that the state may resume the use of the water leased whenever it shall be needed for navigation; but if it does so for so long a time as to destroy the object of the lease (which fact shall be determined by certain free-holders), the lessee may be absolved from his obligations under it.

This lease was not recorded until January 12, 1869, when it was recorded in the record of leases in this county. But it seems that Myers used the privileges granted from the time provided for in the lease, until he assigned the lease to Augustus Pilliod in the fore part of January, 1869, and from that time until after the plaintiff claims to have acquired right under it, use was made of the water by Pilliod and his .assignees or grantees.

On January 27, 1869, said Pilliod, having received an assignment of the lease from Myers, entered into a certain written contract with the state through P. L. V. Herzing, Acting Commissioner for the state for that part of the canal, as follows:

"Whereas, a lease for water power on the Miami & Erie canal, embracing the fall of the two lower locks in the city of Toledo, made by Abner L. Backus, acting commissioner of public works, to James W. Myers, dated eighteenth of February, 1859, which lease, by several assignments, or transfers, is now in the possession of and owned by Augustus Pilliod, and whereas, said lease provides for the use and occupation of water sufficient to propel one saw and two pair of mill stones without designating the quantity of water due for the purpose, now therefore, to avoid disputes in regard to the quantity of water due by the terms of the lease, it is hereby mutually agreed by Augustus Pilliod of the one part and the state of Ohio, by P. V. Herzing, member of the board of public works, of the other part, that hereafter 700 cubic feet of water per minute shall constitute the quantity due for the saw and 900 feet for the two pairs of mill stones, making in the whole 1600 cubic feet per minute, the quantity due for all purposes under the terms of the aforesaid lease.

"Witness our hands and seals this 12th day of January, 1869.

"AUGUSTUS PILLIOD,                  [Seal]
"P. L. V. HERZING,                  [Seal]
"Actg. Comm. Board Pub Works."

This agreement was recorded in the record of leases of Lucas county, January 20-27, 1869.

January 9, 1872, said Pilliod took from the state a renewal lease under the terms provided for that purpose in the original lease, for 1600 cubic feet of water per minute, for a term of thirty years from March 29, 1872, with the usual provision for a renewal for an additional term of thirty years. This lease contains the following provisions and recitals: "said sixteen hundred cubic feet of water being leased in renewal of the original lease, made by James Myers (and by assignments regularly made, now the property of Augustine Pilloid), which is dated February 18, 1859."

The other provisions of the lease are similar to if not identical with those of the original Myers lease, except that the amount of the rent is increased.

This last mentioned lease was assigned by said Pilliod to R. K. Scott on February 24, 1880, and the same was, by said Scott, assigned to the plaintiff, Detwiler, March 29, 1881. These various assignments were consented to by the proper state officer, and were recorded respectively soon after the respective dates thereof.

The defendants trace their right to the use of the 1700 cubic feet of water per minute under a lease originally made by the state to one Solomon Lind in the year 1886, and a lease to the city itself in the year 1879.

The said lease to said Lind is dated February 12, 1866, but was not recorded in the

records of this county till December 19, 1869, when it was so recorded.

This leased to said Lind for a term of thirty years from May 1, 1866, with a provision for a renewal for a term of thirty additional years, 1700 cubic feet of water per minute. It was made on the same kind of printed blank used for the said Myers lease, and contains substantially the same provisions as the Myers lease, but does not refer to it in any way. It also provides that, "the water hereby leased to be taken out of the level of the Miami and Erie canal between lock No. 2, Toledo side cut—south end of Swan creek aqueduct." And also the following provision: "The state being the owner of the ground on the heel-path bank between the points designated where the water is to be taken under the lease, it is understood and agreed that the state will furnish the necessary land on which the water is to be used."

The place designated for the taking of the water, though not on the same direct line as that specified in the Myers lease, is on the same level of the canal.

There was no proof given before us that any use was made of the water mentioned in the Lind lease before the erection of the work-house by the city or that any mill or other structure was built for that purpose, or that either Myers or his successors in title of his lease ever had any actual notice or knowledge of the existence of the Lind lease till 1879, or later.

About May 8, 1879, by a lease dated at its head April 1, 1879, the state acting by said Herzing, one of the canal commissioners, leased to the city of Toledo the right to use 1700 cubic feet of water per minute from said level and certain land therein described, for the purpose of a stone-yard and prison or work-house, for the period of thirty years from the 1st day of December, 1877, with the usual provision for a renewal for a further term of thirty years.

This lease contains the recital: "This lease being in renewal of a lease for the same quantity of water and part of the same land granted to Solomon Lind and dated February 12, 1866, which said lease is cancelled and becomes null and void by consent of the parties thereto."

This lease was signed by the mayor of the city pursuant to a resolution of the common council of May 5, 1879, and is the lease under which the defendants now claim (together with the said Lind lease.)

It would seem to admit of no doubt that the plaintiff has priority of right, at least, to so much water as was leased in the said original lease to Myers, for the original Myers lease is not questioned, and it was regularly assigned with the consent of the proper state officers, and was owned by Mr. Pilliod in 1872 when the state granted to him the extension provided for in the original lease, then executing to him for that purpose a new instrument which would clearly have the effect of continuing the prior right to the use of water enough to run one saw and two run of mill stones of the size specified "with labor saving machinery attached." It is claimed, however, by the defendants, that the amount of water thus designated is shown by the evidence to be but 882 cubic feet per minute, and that as to that only has the plaintiff a right to the use of the water prior to that of the defendants, while the plaintiff contends that the proof does not show that that is the amount covered by the Myers lease, and further that the indefinite terms of the lease were rendered definite and fixed by the said agreement of January, 1869.

A witness for the defendants testified that years ago a man by the name of Forrer, at the instance of the state canal officers, instituted and carried on certain experiments at Dayton, Ohio, as to the quantity of water in cubic feet per minute required to run an upright saw and a run of mill stones with a certain fall of water, and that it was there determined that with a fall of fifteen feet, a run of mill stones would require 300 cubic feet per minute, and that a saw was equivalent to one and a half run of stone, and the witness further stated that with a fall of 14 feet, as at the plaintiff's mill, a run of stone would require 252 feet, and a saw one and a half times that amount, and that the canal officers always considered these results of Mr. Forrer's experiments when leasing water power. It did not appear, however, that Mr. Myers was aware of this, or that it was generaly known, or known to any except the state officers, or that the wheels, stones or saw used, or to be used by Myers were such as were used by Mr. Forrer in his experiments, or that by the terms of his lease, and the circumstances attending its taking, he was bound to know that the power he should employ should be measured and limited by applying the rule of equivalents

furnished by considering the Dayton experiments as unquestionably accurate. He would be limited to so much water as would run such machinery as was described in his lease, or the quantity commonly known or considered in the vicinity as meant and intended by the terms employed, or by the legal rules and regulations of the canal officers in that regard, if known to him at the time, or which had been adopted and published in such manner as to charge him with notice thereof; but without notice or knowledge, he was not bound to know the result of said experiments, or the meaning given in the mind of the canal commissioner to the words employed in the lease, unless they had that legitimate meaning. Besides, by the terms of this lease, Myers was to have water sufficient not only to run a saw and two run of mill stones, but to run "the labor saving machinery attached." What this was, or was to be, does not appear in the testimony, nor is it at all clear from the testimony that even the usual machinery in a grist or flouring mill other than the stones, was considered in the Dayton experiments, so that by reason of the indefinite terms employed in the original Myers lease there was great chance for honest differences of opinion and disputes over its construction, and which, we think, it was entirely competent and proper for the parties to it to avoid or settle by such an agreement as that of January 27, 1869, which was entered into by Pilliod and the state canal commissioner. The state commissioner who thus consented to that agreement, in which it is stipulated that said original lease means 700 cubic feet per minute for the saw and 900 cubic feet for said two run of stones, was the same person who acted for the state in making the said Lind lease in 1866, and that afterward acted for the state in making to Pilliod the lease of 1872 for 1,600 feet of water in renewal of the Myers lease, and we find it difficult to believe that he would have so acted, if, as a matter of fact, by the rules of the commissioners, when applied to such a lease as the Myers lease, water to run a saw meant only 378 cubic feet, and water to run two four and one-half feet mill stones meant only 504 cubic feet. To suppose that he would do this, if the facts were as the defendant now claims them to have been, would be to suppose him very ignorant or very careless of the interests of the state which he represented, at least. There was a sufficient consideration for the agreement of January 27, 1869, and we think that the terms of the Myers lease should be interpreted by the aid to be derived from it, notwithstanding the lease of 1866 to Lind, which was not recorded till long after January, 1869, and of which Mr. Myers is not, nor is Pilliod, shown to have had notice. All these leases include the leasing of land as well as water privileges, but none of them are acknowledged before any officer, as is required for leases for terms exceeding three years, and perhaps are not properly the subject of record in the lease records of the county. But we think that the record provided for by secs. 7675-2 is not for the purpose of furnishing notice of such leases, as no statute declares such record to have that effect, but that it is a safe and convenient way for the board of public works to preserve copies of the leases granted by it. The right is not given to the lessee to have his lease so recorded, nor does the statute impose any duty on him to file his lease with the board, or have it recorded in its books; nor would a contrary opinion affect our conclusions in this case, since there is no proof before this court as to when any of said leases were recorded, as provided in said above named section.

We conclude that the plaintiff has a right to draw from said level 1,600 cubic feet of water, and that his right is prior and superior to the right of the defendants to use water from the same level.

Some claim was made that the plaintiff is estopped from interfering with the defendants' right to use their 1,700 feet of water by reason of his standing by and seeing work done and expense incurred by the city in constructing its work-house and placing its machinery with reference to using the water to supply power therefor, but the facts necessary to create such estoppel are not proved. It is not shown that the plaintiff knew that the city was expending money in erecting

structures that would require the use of water from said level so as to interfere with his use of 1,600 cubic feet per minute.

It is urged in argument by defendants' counsel that the plaintiff cannot maintain this action against the defendants for the reason that the plaintiff has not alleged in his petition, nor shown by evidence, that he had unsuccessfully applied to the state authorities for relief, and that he should have applied to the state to let more water into said level, either by letting more into the canal at Providence Dam, or by preventing the prior lessees of the state upon the upper levels of the canal, from using more water than their leases called for; or else that the plaintiff should have brought his action against said upper lessees to restrain them from preventing the proper amount of water from coming into said lower level, and that it was not competent for him to select the defendants alone and bring his action against them only.

We have considered these claims, and will say regarding the second that it does not appear in any of the pleadings that there are in fact such upper lessees, and no such leases were offered in evidence, though there was some oral evidence by persons who claimed to have some knowledge of the number of such leases and of the amount of water therein leased, and some evidence tending to prove that certain of such lessees were using more water from the upper levels of the canal than their leases called for. Perhaps it would have been proper for the plaintiff to have brought in all persons who had or claimed the right to use the water from the canal above him, so that in one action the court might determine their respective rights, and make the proper orders requiring them to limit their use of water to the respective amounts which the court might find due them under their leases. See Adams et al. v. Manning et al., 48 Conn., 477 (489).

But we see no reason why the plaintiff should be compelled to attack the lessees on the levels lying above the one in question. Of the water coming into this lower level he had the right to the first 1,600 cubic feet of surplus, and if he got that he could run his mill. The defendants, by using the water in the way they have arranged to use it, prevent him from getting the water which he is entitled to. The injury thus inflicted is one immediately inflicted by the acts of the defendants, and we think his action will lie against them; and this same consideration would also make it equally unnecessary for him to apply to the state officers for redress. The state was sending into the level for his use substantially water enough to supply the terms of his lease, which, as we find, had the prior right to it, and the failure to supply additional surplus water sufficient for the use of the defendants, was a matter in which they, rather than the plaintiff, were interested to remedy. See 16 Pick., 527.

As to the form of the action:

The authorities established this doctrine:

"Where there are different owners of rights in the same water power or privilege, and the existence of the right of each has been established at law, or is admitted, but the owners disagree as to the extent of the several rights in the common property, a court of equity will interfere to regulate the use, and to define and limit the respective rights of the several owners." Ranlet v. Cook, 44 N. H. 512; Burnham v. Kempton, 44 N. H. 78 (94); Bardwell v. Ames, 22 Pick. 331; Gould on Waters, section 506 and cases cited.

That the plaintiff and the defendants have certain rights to the use of water from the level in question, though not directly admitted in the pleadings, was practically admitted on the hearing; at least, the main matter in controversy between them was not so much whether each had some right, but as to the extent and priority of rights; and for this reason, as well as several others, we think the plaintiff can maintain this action without having first settled his rights in other forms of action, or applying for other remedies.

The case of Ranlet v. Cook, *supra*, involves several of the main questions at issue in the case at bar, and we are satisfied of the soundness of its reasoning upon them.

It is said that the plaintiff's weir is not set as low as by the terms of his lease he has the right to have set, but the proof is that it was placed by the state

officer designated in the lease as the authority under whose direction it should be placed, maintained or changed. Neither the state or the canal officials are parties here, and we could make no effective order regarding the fixing of the weir, nor do we see that this can make any practical difference to the defendants, though they might perhaps apply to the canal engineer or commissioner regarding it. A finding of fact is requested in the case, and it may be prepared by counsel desiring it, and submitted to counsel on the other side, and then presented to the court for adjustment and allowance.

The decree will be for the plaintiff enjoining the defendants from using the surplus water in said level until the plaintiff has been supplied with the amount to which we find him to be first entitled, viz.: 1,600 cubic feet per minute, whenever he wishes to use the same, or so as to interfere with or prevent his using that amount when he chooses. We think it practical for the parties to so arrange by agreement as to provide for this in such way as to give to each the use of so much water as he would be entitled to under this finding, and so that the defendants can have the use of what would go to make up the plaintiff's 1,600 feet when he does not wish to use it. If the parties can agree as to the method of accomplishing this, they may do so and report to the court their agreement within —— days, otherwise the court will appoint a commission to investigate the matter and report a plan to the court, and on the report of the agreement of the parties, or the report of the commission, the final decree will be entered in accordance with this opinion.

The costs of this action are adjudged against the city of Toledo.

E. D. Potter, Jr., and A. F. Hansen, for plaintiff in error.

Hon. D. R. Austin and W. H. A. Read, City Solicitor, for defendants in error.